IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,　　　　　　　Case No. 08-CR-453-KI

　　　　　Plaintiff,　　　　　　　　　　　　　　　OPINION AND ORDER

　　v.

**JOHN BRENT LEISKE**,

　　　　　Defendant.

　　David Bybee
　　Kathleen Hamann
　　U.S. Department of Justice
　　1400 New York Ave.
　　Bond Building, Suite 4102
　　Washington, D.C. 20530

　　　　　Attorneys for Plaintiff

　　Kristen Winemiller
　　Lisa Maxfield
　　Robert Hamilton
　　Tiffany Harris

Page 1 - OPINION AND ORDER

Pacific Northwest Law, LLP
1420 World Trade Center
121 S.W. Salmon Street
Portland, OR 97204

      Attorneys for Defendant

King, Judge:

Defendant John Brent Leiske was indicted on October 8, 2008 with three counts of Wire Fraud, under 18 U.S.C. §§ 1343 and 2, and 14 counts of Engaging in Monetary Transactions with Criminally Derived Property, under 18 U.S.C. §§ 1957 and 2. Pending before me is Leiske's Motion to Suppress [87] and Request for Discovery [89]. For the following reasons, I deny defendant's Motion to Suppress and grant in part and deny in part his Request for Discovery.

## BACKGROUND

Leiske, "together with others known and unknown to the grand jury," is charged with devising a scheme to obtain $5,000,000 from an elderly investor named Bill Britt, an individual living in Florida and North Carolina, using material false and fraudulent representations and promises. Indictment ¶ 4. Leiske is alleged to have told Britt he was a CPA, that he had access to unique investment opportunities, and knew about a tax saving opportunity called a "tax treaty" with the IRS. The funds for the "tax treaty" had to be deposited into the account of an undisclosed D.C. law firm. He allegedly directed Britt to wire transfer the funds into a client trust account of an attorney in Michigan. The money was eventually deposited into Leiske's account in the name of Wilco Lewis Trust at the Bank of the West in Portland. Leiske used the money for himself.

Based on the testimony of FBI Agent George Steuer and Brian Brackinreed, the following facts were adduced at an evidentiary hearing:

The indictment here in Oregon was preceded by several events. FBI agents began investigating Leiske and others in California in 2006 for a fraudulent investment scheme. The FBI agents did not know that Britt had invested with Leiske and, represented by attorneys at Dunn Carney, had brought a civil lawsuit against Leiske in Multnomah County. During the course of that civil lawsuit, the Dunn Carney attorneys seized only the computers and hard drives from Leiske's home office (and no other property) pursuant to writs of execution on the $10 million default judgment they obtained in the Multnomah County case. The writs were carried out on May 30, 2007, the computers were put up for auction at the Sheriff's office on June 12, and Dunn Carney was the highest bidder. Dunn Carney never took actual possession of the computers but left them in the custody of the Sheriff until they were transferred to the Multnomah County District Attorney's office. On September 12, state prosecutors transferred the computers to the Regional Computer Forensics Lab ("RCFL") for mirroring. On December 5, 2007, the RCFL made three sets of "mirror" copies of the original hard drives; two of the three sets were transferred back to the DA's office, and the third was returned to Dunn Carney. On June 25, 2008, the DA's office released the original computers to the FBI. The Assistant United States Attorney prosecuting this case does not intend to use these original computers as evidence.

During early 2008, the FBI learned about Brian Brackinreed, who worked for Leiske. After the FBI contacted him, Brackinreed mentioned the communication while he was visiting Leiske in Palm Springs. Leiske told Brackinreed not to worry, that Leiske had been interviewed by the FBI about 15 times, and advised Brackinreed to answer the questions honestly.

Page 3 - OPINION AND ORDER

The FBI requested an interview with Brackinreed, which took place on April 15, 2008. Brackinreed was represented by Steven Sherlag and Gary Rhodes; Michael Hintz, a private investigator hired by Sherlag, was also present at the interview. Brackinreed spoke to the agents again on April 21, 2008, with the same parties present. At these interviews, the FBI asked Brackinreed questions both about the events in California as well as about Britt.

Brackinreed explained he worked for Leiske and performed the following tasks: answering phones; maintaining and backing up the networked computer system; paying rent and utility bills; retrieving messages; scheduling meetings and trips; depositing and writing checks; handling money wire transfers; picking up the mail; cleaning the office; setting up LLCs; and receiving, copying and filing investor packets. He had signature authority on five or six bank accounts. He worked in the downstairs office in Leiske's home, which contained four or five desks with computers, along with Leiske, Leiske's two nephews, and Leiske's girlfriend.

Brackinreed met with the FBI a third time on April 29, 2008. During this last interview, Brackinreed brought four documents with him and volunteered these documents to the agents.

Also, at that visit Brackinreed told the FBI about a storage locker leased in the name of Susan Brown. Brackinreed made it clear Brown had no control or access to the locker; in fact, Brackinreed was the only one with the access code and he had the only key. Brackinreed obtained the locker when Leiske directed him to close the home office and move the boxes to storage in April 2007. Brackinreed had personally moved the boxes of documents from the home office to the locker with a friend's help. Although Leiske had closed the home office a year earlier, it was Brackinreed's job to pay the utilities for the office and the rental fee for the storage. Leiske was living in Palm Springs, but he continued to pay Brackinreed's salary during

Page 4 - OPINION AND ORDER

this time.  Brackinreed had accessed the storage on three or four occasions to obtain tax documents for one of Leiske's nephews.

The agents asked to see the documents in the storage locker.  Brackinreed and his attorney agreed and everybody traveled to the locker.  To open the exterior door, Brackinreed entered the storage locker number and a code, and he punched in the code again to use the elevator up to the second or third floor.  He used his key to open the unit itself.  The agents spent thirty to forty minutes taking a cursory inventory; they pulled about six boxes open and confirmed the documents were associated with Britt.

The agents then traveled to Brackinreed's house where Brackinreed signed a consent to search computer form.  Brackinreed turned over to the FBI four back-up external hard drives he had removed from the closed home office.  He had brought these hard drives to his house around the time of the Multnomah County Sheriff's office's seizure of the computers from the home office in May 2007 and, since one of his job duties was to back up the computer, he had continued to update them as necessary.  He had complete access to the networked computers.  In the agents' presence, Brackinreed accessed Leiske's email with Leiske's password and printed out and gave the agents hard copies of a number of e-mail messages.  After the agents retrieved the computers, they booked them into the FBI office, then turned them over to the RCFL on May 27 where they were then imaged on June 18, 2008.

The agents and Brackinreed moved the boxes to a larger locker and placed a dual system of locks so that neither the government nor Brackinreed could access the documents without the other.

The agents looked at the documents over the course of April 30 and May 1, 2008. Every day before beginning their examination, they contacted Sherlag to confirm Brackinreed had not withdrawn his consent.

On May 21, Sherlag contacted Agent Steuer and informed him that Leiske had left a message for Brackinreed indicating Leiske "would be relieving him of his responsibilities due to recent developments with Susan Brown. Leiske further advised he would be in Portland the following week and would like to meet with Brackinreed to discuss relieving him of his duties." Tr. 52. Agent Steuer heard the actual message at Sherlag's office on June 17; Leiske "indicated that an individual by the name of Sander would relieve him, Brackinreed, of his previous duties. Leiske indicated that additional resources would be forthcoming to help him. Leiske further instructed Brackinreed to maintain his mobile phone that he was using until June 2008." Tr. 50. (Sander was Susan Brown's husband.) Agent Steuer did not preserve the message. Brackinreed testified Leiske never "fired" him, that he did not think anyone asked for the key to the storage unit, and that he never had any conversations with Sander. No one ever contacted him about the documents, the computers, or the bank accounts. He thought the duty Sander was taking over was making mortgage payments.

On May 22, a day after Agent Steuer first learned that Brackinreed would be relieved of his duties, a grand jury subpoena was served on Brackinreed through Sherlag which sought records in Brackinreed's custody or control. The agents continued reviewing the documents in the storage locker on May 27 and 28, with the consent of Brackinreed and in the presence of Brackinreed's private investigator. They obtained a signed written consent from Brackinreed on

May 26.  The FBI received sole custody of the storage locker when Sherlag agreed that the documents were responsive to the subpoena on October 2, 2008.

## DISCUSSION

I.    <u>Motion to Suppress</u>

Defendant moves to suppress all evidence seized from Brackinreed or deriving from seizures made in the course of negotiating with Brackinreed.  Defendant also moves to suppress all evidence seized from principals or agents of Britt, including counsel for Britt.

The government breaks the evidence into three categories:  (1) the documents Brackinreed gave the agents in Sherlag's office on April 29, 2008, and later in his home on that same day; (2) the storage locker documents; and (3) the computer hard drives.

A.    <u>Whether the Fourth Amendment Applies to the Seizure of all Three Categories of Evidence and to the Search of the First Category of Documents</u>

The government first argues the way in which this evidence came into the FBI's hands does not implicate the Fourth Amendment at all, at least with respect to their seizure (as opposed to their search).  The law permits a private individual to turn business documents over to law enforcement, even where the documents have been stolen.  <u>Burdeau v. McDowell</u>, 256 U.S. 465 (1921).  The evidence was all obtained by Brackinreed long before the FBI became involved.

Additionally, the government contends that although custody or control of evidence may be disputed when the records are at a separate location, there is no question that the first category of documents–those Brackinreed gave to the FBI in Sherlag's office and later that day in his home–are not subject to the Fourth Amendment.  Brackinreed voluntarily gave the documents to the FBI.  The government points to <u>Coolidge v. United States</u>, 403 U.S. 443, 488-89 (1971),

overruled on other grounds by Horton v. California, 496 U.S. 128 (1990).  In that case, a wife voluntarily gave her husband's clothing and guns to the police.  The Court explicitly rejected the requirement that the agents seek permission from the husband and refused to consider whether the husband had authorized his wife to release the evidence.  Similarly, in United States v. Sherwin, 539 F.2d 1 (9th Cir. 1976), the manager of a freight company took two books from a shipment and handed them over to the FBI.  The Court concluded, "a consensual transfer is by definition not a seizure" and "only the fact of consent is relevant, not whether it was properly authorized."  539 F.2d at 7.

At least with respect to the seizure of the evidence, I agree with the government.  Further, I agree that there is no reason to suppress the documents Brackinreed gave the agents in Sherlag's office on April 29, 2008, and later in his home on that same day.  Indeed, Leiske appears to have dropped any argument with respect to these documents.

B.   Storage Locker

As for the storage locker, the government agrees Leiske had a reasonable expectation of privacy in the storage locker, both because of his possessory interest in the documents and the fact that they were stored at another location and in a locked container.  The question is whether Brackinreed had actual or apparent authority over the storage locker to make the FBI's search lawful.

The government relies on Brackinreed's consent to search the storage locker as an exception to the warrant requirement.  The government has the burden of establishing the effectiveness of a third party's consent to search in one of three ways:  (1)  evidence of both shared use and joint access to or control over a search area which demonstrates actual authority

Page 8 - OPINION AND ORDER

to consent; (2) express authorization from the owner of the property for the third party to give consent to search; or (3) evidence that the third party had apparent authority to consent. United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993).

The common authority doctrine requires mutual use of the property by those generally having joint access or control for most purposes. United States v. Yarbrough, 852 F.2d 1522, 1534 (9th Cir. 1988); United States v. Dearing, 9 F.3d 1428, 1429 (9th Cir. 1993). It must be reasonable to recognize that any of the parties have the right to consent to inspection and that the others have assumed the risk that one of the third parties might give consent. Yarbrough, 852 F.2d at 1534. A person with only limited access to the property lacks actual authority to consent to a search. United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997).

The government points to the following factors to show "shared use" and "joint access": Brackinreed's free and unrestricted authority to access; he paid for the storage locker; he alone knew the code to the facility and elevator; he alone had the key to the locker; he organized the records and put them in storage; he did not need permission and was given the responsibility for putting the documents in storage; he subsequently entered the storage room on three occasions to obtain documents for Leiske's nephew. I find these facts demonstrate Brackinreed's joint access and control of the storage unit and of the documents stored there. See United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir. 1978) (person with key and access throughout residence can give valid consent); United States v. Gulma; 563 F.2d 386, 389 (9th Cir. 1977) (of "special significance" that defendant "entrusted" the motel key to person who consented to search); United States v. Green, 523 F.2d 968, 971 (9th Cir. 1975) (consent given by key-holder). In short,

Leiske "assumed the risk" that Brackinreed would consent to a search. See Yarbrough, 852 F.2d at 1534.

In his supplemental memorandum, Leiske argues I need not evaluate whether Brackinreed had actual authority to consent because Leiske terminated Brackinreed's employment on May 21, 2008, thereby revoking any authority Brackinreed had over the storage unit.

The government urges that the status of Brackinreed's employment makes little difference because Brackinreed's authority to consent to the search is based on his own right to consent, a right which Leiske risked Brackinreed would exercise. The problem with the government's position is that over the course of Brackinreed's encounter with the police, his degree of access and control may have changed depending on how Leiske's message is interpreted. This is not a case where the defendant is asking the Court to consider the effect of his own refusal to consent, in light of a co-resident's permission to search. See e.g. Georgia v. Randolph, 547 U.S. 103 (2006) (physically present co-resident's refusal to consent overrides other resident's consent). Instead, this is a case where Brackinreed's actual authority may have changed–he may no longer have had mutual use or control over the storage locker. See United States v. James, 353 F.3d 606, 615 (8th Cir. 2003) (in examining apparent authority, police intercepted letter giving authority only to destroy discs, not to store them; at this point, officers knew actual authority had changed).

Nevertheless, Leiske's message had no effect on Brackinreed's actual authority to consent. Leiske's message was that Brackinreed would *in the future* be relieved of his duties and that he would meet with Brackinreed to transfer responsibilities. Further, Sander never contacted Brackinreed and no one attempted to obtain the key or the code to the storage unit. Additionally,

Brackinreed, the person presumably most knowledgeable about his duties, and someone I found credible, thought Leiske meant Sander would now be responsible for making mortgage payments. In short, I have no trouble on this record in concluding that Brackinreed had actual authority to give consent to the agents to search the storage unit. Consequently, I need not address the government's apparent authority argument.

Leiske is suspicious that Agent Steur did not preserve the voicemail message relieving Brackinreed of his duties, suggesting that the message must have been different from Agent Steuer's recollection and reports. In addition, Leiske implies from the agents' quick actions in obtaining the grand jury subpoena and in obtaining Brackinreed's written consent to search that they feared Brackinreed no longer had actual authority to consent. There is no evidence that the voicemail message was different from Agent Steuer's testimony and contemporaneously made reports, or that it was different from Brackinreed's recollection of it. Further, as the government argues, the agents' decision to secure a subpoena and get Brackinreed's written consent was just good police work. The government has met its burden of showing effective consent to the search.

    C.    <u>Computer Hard Drives</u>

As with the storage locker, the government agrees Leiske had a reasonable expectation of privacy in the computer hard drives, but it argues that the expectation was so diminished as to be non-existent. The hard drives were in Brackinreed's home, for one thing; Leiske had no reasonable expectation of privacy in anything in Brackinreed's home. The government additionally argues the following facts: the original computer hard drives were networked and accessible by at least four other people who worked in the office (Leiske's two nephews, his

Page 11 - OPINION AND ORDER

girlfriend, and Brackinreed); Brackinreed's job was to back-up the hard drives and load documents onto the hard drives; he had complete access to everything on the hard drives; when the FBI obtained the hard drives from Brackinreed, he had access and control of them; these hard drives were backups of those previously seized by the Sheriff's office, and the contents were now open to view by attorneys at the Dunn Carney firm and anyone else to whom they chose to show the content.

 I assume without deciding that Leiske continued to have a reasonable expectation of privacy in the backup computer hard drives.  Nevertheless, for the same reasons he had actual authority to consent to the storage unit search, and for some of the same reasons the government argues Leiske's privacy interest was diminished, Brackinreed had actual authority to consent to the agents' search of the hard drives.  The hard drives had been in his house for months and he was in charge of them.  The hard drives had previously been networked and everything on them was accessible to Brackinreed; further, it was his job to back up the computers.  As I held above, Leiske's ambiguous statement about Brackinreed's being relieved of his future duties did not change Brackinreed's actual authority to consent at the time he did.  Accordingly, I need not discuss the government's alternative apparent authority argument, nor its inevitable discovery argument.

 Similarly, since the government does not intend to offer the original computers into evidence–those that had been obtained by Dunn Carney via the Sheriff's writ of execution–I need not hold a separate hearing on whether state action resulted in the seizure of those computers. The government referred to these computers only to underscore its argument that Leiske no longer had an expectation of privacy in those computers.

Defendant's Motion to Suppress is denied.

II.      Request for Discovery

Leiske reports that most of the items identified in his Request for Discovery have been resolved. There remain only the following items:

  A.      Paragraph 5

Leiske's request in paragraph 5 is for all prior reports Britt made concerning fraud. Apparently, this is not the first time Britt claims to have been defrauded.

The government reports that it has no authority to require various state agencies to provide these materials. Further, it has no knowledge about what other federal agencies are investigating (such as the IRS or the Commodities Futures Trading Commission). It does, however, report that it does not have any state reports related to state prosecutions of anyone who defrauded Britt, it does not know of any Department of Justice investigations, and it has no information that would lead it to believe the IRS audits were more than civil in nature.

Leiske's motion is denied.

  B.      Scheduling Order

Leiske seeks a deadline of September 26, 2011 for the government to provide him with a witness list, Giglio evidence, Rule 404 evidence, and its exhibits.

It has been determined to be within the court's inherent power to order the government to disclose its witnesses early, as part of the court's management of its own docket. United States v. W.R. Grace, 526 F.3d 499, 503 (9th Cir. 2008) (en banc). A determination about whether the time is too early is evaluated under an abuse of discretion standard.

Leiske argues that this is a complex case and involves litigation in California in which dozens of defendant's friends, family members and associates were interviewed who are not relevant to the allegations involving Britt.  Defendant argues disclosure will streamline the case for trial and help clarify the government's <u>Brady</u> and <u>Giglio</u> obligations.

The government is to provide a tentative list of its witnesses (with a right to supplement), along with <u>Giglio</u> and Rule 404 evidence, by November 21, 2011.  The government shall provide its exhibits by December 23, 2011.

C.     <u>Britt Evidence</u>

Leiske seeks in paragraph 4 the dates of any meeting or communications between the government and Britt or his attorneys, materials exchanged during meetings, and communications and correspondence between the government and Britt's attorneys.  Leiske contends this evidence may prove entanglement between the private attorneys and the government in enforcing the civil judgment, which he argues is relevant to the Motion to Suppress.

As I have concluded above, any state involvement in Dunn Carney's pursuit of Leiske's computers is irrelevant to this motion.  Furthermore, the government responds that it has provided all it has on the subject.  I deny Leiske's further request.

D.     <u>Grand Jury Vote</u>

Finally, Leiske seeks the number (not names) of grand jurors attending each session and the number (not names) voting to indict (paragraphs 44 and 45 of its Request for Discovery). Defendant cites cases from the Eastern and Northern District of California, and the Third and Seventh Circuits, permitting disclosure of what he calls "ministerial records" of grand jury

proceedings, including grand jury term dates.  United States v. Fuentes, No. CR.S-07-0248 WBS, 2008 WL 2557949 (E.D. Cal. June 24, 2008); United States v. Diaz, 236 F.R.D. 470, 479 (N.D. Cal. 2006); In re Grand Jury Investigation, 903 F.2d 180, 182 (3rd Cir. 1990); In re Cudahy, 294 F.3d 947, 951 (7th Cir. 2002).  Leiske suggests this rule is equally applicable with respect to the number of jurors who attended and voted.

The government argues the information would intrude too deeply into the grand jury's work.  There is no indication that anything atypical occurred with this grand jury or that the return was not acceptable.

Leiske gives no reason justifying disclosure of this information.  Further, I have never seen this information disclosed, and I decline to do so now.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Suppress [87] is denied and his Request for Discovery [89] is granted in part and denied in part.

IT IS SO ORDERED.

DATED this    27th    day of July, 2011..

    /s/ Garr M. King
Garr M. King
United States District Judge

Page 15 - OPINION AND ORDER